**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| NAVAJO NATION,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR;<br>KENNETH LEE SALAZAR, in his<br>official capacity as Secretary of the<br>USDOI; NATIONAL PARK SERVICE;<br>JONATHAN B. JARVIS, in his official<br>capacity as Director of the National<br>Park Service; TOM O. CLARK, in his<br>official capacity as Park<br>Superintendent, Canyon de Chelly<br>National Monument,<br>*Defendants-Appellees*. | No. 13-15710<br><br>D.C. No.<br>3:11-cv-08205-<br>PGR<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Paul G. Rosenblatt, Senior District Judge, Presiding

Argued and Submitted
June 10, 2015—San Francisco, California

Filed April 6, 2016

Before: Mary M. Schroeder, Sandra S. Ikuta,
and Morgan Christen, Circuit Judges.

Opinion by Judge Christen;
Dissent by Judge Ikuta

---

## SUMMARY[*]

---

**Native American Graves Protection and
Repatriation Act**

The panel reversed the district court's dismissal of the Navajo Nation's suit seeking an injunction ending the National Park Service's inventory, pursuant to the Native American Graves Protection and Repatriation Act ("NAGPRA"), of human remains and funerary objects removed from the Canyon de Chelly National Monument on the Navajo Reservation; and the immediate return of the objects taken from the reservation.

The panel held that the district court had jurisdiction to consider the Navajo Nation's claims because the Park Service's decision to inventory the remains and objects was a final agency action within the meaning of the Administrative Procedure Act. The panel also held that by deciding to undertake NAGPRA's inventory process, the Park Service conclusively decided that it, and not the Navajo Nation, had the present right to "possession and control" of the remains and objects. 25 U.S.C. § 3003(a). The panel remanded for further proceedings.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Judge Ikuta dissented because she would hold that because there was no final agency action reviewable under § 704 of the Administrative Procedure Act, the United States has not waived its sovereign immunity and the court lacks jurisdiction to hear the appeal.

## COUNSEL

Paul Spruhan (argued), Assistant Attorney General; Harrison Tsosie, Attorney General, Navajo Nation Department of Justice, Window Rock, Arizona; Paul E. Frye and William Gregory Kelly, Frye Law Firm, Albuquerque, New Mexico, for Plaintiff-Appellant.

Mary Gabrielle Sprague (argued); Robert G. Deher, Acting Assistant Attorney General; David C. Shilton; Andrew C. Mergen, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Defendants-Appellees.

**OPINION**

CHRISTEN, Circuit Judge:

The Navajo Nation appeals the district court's dismissal of its suit seeking immediate return of human remains and associated funerary objects taken from its reservation. The Nation describes these remains and objects as "among the most sacred of [its] property" due to its deep spiritual belief that upon death humans should be placed in the earth and left there undisturbed.

Between 1931 and 1990, the National Park Service removed 303 sets of human remains and associated funerary objects from Canyon de Chelly National Monument, a sacred site on the Navajo Reservation. In the mid-1990s, the Park Service decided to inventory the remains and objects pursuant to the Native American Graves Protection and Repatriation Act (NAGPRA) with the ultimate goal of repatriating the remains and objects to culturally-affiliated tribes. The Navajo Nation sued seeking, *inter alia*, an injunction ending the inventory process and returning the remains and objects. The Navajo Nation argued that the Park Service's decision to inventory the remains and objects instead of returning them violated Navajo tribal treaties, various statutes, and the Fifth Amendment to the United States Constitution. The district court dismissed the suit as barred by sovereign immunity, reasoning that the Park Service had not yet taken any final agency action as to its disposition of the remains and objects.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse the district court's judgment. We hold that the district court had jurisdiction to consider the Navajo Nation's claims because the Park Service's decision to inventory the

remains and objects was a final agency action within the meaning of the Administrative Procedure Act. By deciding to undertake NAGPRA's inventory process, the Park Service conclusively decided that it, and not the Navajo Nation, has the present right to "possession and control" of the remains and objects. 25 U.S.C. § 3003(a). We reverse the district court's order and remand for proceedings consistent with this decision.

## BACKGROUND

Canyon de Chelly is a spectacularly beautiful geological site consisting of over twenty miles of red sandstone walls rising hundreds of feet above the ground. *See* S. Rep. No. 71-1395, at 2 (1931); Fig. 1.

Figure 1[1]



---

[1] *Places Reflecting America's Diverse Cultures*, Nat'l Park Serv., http://www.nps.gov/nr/travel/cultural_diversity/Canyon_de_Chelly_National_Monument.html (last visited Mar. 8, 2016).

Humans have lived in the canyon's caves for thousands of years.[2]  Hopi and Pueblo Indians were the canyon's primary occupants from roughly 750 A.D. until the 1600s.[3]   The Navajo began living in the canyon in significant numbers around the late 1600s.  *Id.*  Navajo live in the canyon to this day and consider Canyon de Chelly sacred ground.[4]  Navajo creation stories include events in the canyon, and Navajo lore maintains that key spiritual figures still reside there.  *See* Kelli Carmean, Spider Woman Walks This Land: Traditional Cultural Properties and the Navajo Nation x, xvii–xx (2002).

In 1849, the United States and the Navajo Nation signed a treaty acknowledging that the Navajo Nation was "under the exclusive jurisdiction and protection of the government of the said United States."  Treaty Between the United States of America and the Navajo Tribe of Indians, U.S.-Navajo Nation, September 9, 1849, 9 Stat. 974, 974.  But in 1864 the federal government forcefully and violently removed the Navajo from their lands, including Canyon de Chelly, and relocated them to Fort Sumner, 300 miles away.[5]  Navajo villages and food stores were destroyed during the forced move and hundreds of Navajo died as a result of this forced

---

[2] *See Canyon de Chelly - History and Culture*, Nat'l Park Serv., http://www.nps.gov/cach/learn/historyculture/index.htm (last visited Mar. 8, 2016).

[3] Nat'l Park Serv., *supra* note 1.

[4] David M. Brugge & Raymond Wilson, *Administrative History: Canyon de Chelly National Monument Arizona*, U.S. Dep't of the Interior Nat'l Park Serv. (Jan. 1976), http://www.nps.gov/cach/learn/historyculture/up load/CACH_adhi.pdf

[5] Nat'l Park Serv., *supra* note 1.

relocation. Kristen A. Carpenter et al., *In Defense of Property*, 118 Yale L.J. 1022, 1063 (2009)*.* After four years of exile, the federal government allowed the Navajo to return to Canyon de Chelly, *id.*, and in 1868 the United States and the Navajo Nation signed a second treaty ceasing hostilities and establishing, among other things, the boundaries of the Navajo Reservation, which include all of Canyon de Chelly. Treaty Between the United States of America and the Navajo Tribe of Indians, U.S.-Navajo Nation, June 1, 1868, 15 Stat. 667, 668. Under this treaty, the Navajo Reservation was "set apart for the exclusive use and occupation of the Indians." *Id.* at 671.

In 1906, Congress passed the Antiquities Act, which authorized the President to establish national monuments in order to protect historic and scientifically significant sites. *See* 54 U.S.C. §§ 320101–320303. It also authorized the Secretaries of the Interior, Agriculture, and War to grant permits "for the examination of ruins, the excavation of archaeological sites, and the gathering of objects of antiquity." *Id.* § 320302. The Department of Interior's regulations implementing the Antiquities Act do not treat tribal trust lands differently than other federal land and do not provide any rights to individual Indians or tribes concerning the collection or disposition of artifacts or human remains. *See* 43 C.F.R. §§ 3.1–3.17. All collections made under the authority of the Antiquities Act must be kept in public museums or national depositories. *Id.* § 3.17.

In 1931, after receiving consent from the Navajo Tribal Council, the federal government created a national monument at Canyon de Chelly. 16 U.S.C. § 445. The monument encompasses Canyon de Chelly, two neighboring canyons, and lands adjacent to the canyons. *Id.* The act creating the

monument (the Monument Act) specified that the Navajo Nation retained title to the lands within the monument, but it charged the federal government with the "care, maintenance, preservation and restoration of the prehistoric ruins, or other features of scientific or historical interest" in the monument. *Id.* §§ 445a–445b. Canyon de Chelly National Monument is the only national monument located on land not owned by the federal government.[6] After the monument's creation, the federal government removed certain human remains and associated cultural objects from the monument without the consent of the Navajo Nation. The National Park Service holds at least 303 sets of these remains and objects in its collection at the Western Archeology Conservation Center in Tucson, Arizona.

In 1979, Congress passed the Archaeological Resources Protection Act (ARPA), which established permit requirements for removing archaeological resources from public and Indian lands. 16 U.S.C. § 470cc. Unlike the Antiquities Act, ARPA clearly distinguishes between "public lands" and "Indian lands" held in trust by the federal government. *See id.* § 470bb(3)–(4). Under ARPA, a permit authorizing excavation or removal of archaeological resources located on Indian land requires the consent of the tribe, and tribes are not required to obtain a permit to excavate or remove archaeological resources on their Indian lands. *Id.* § 470cc(g). ARPA's implementing regulations provide that "[a]rchaeological resources excavated or removed from Indian lands remain the property of the Indian or Indian tribe having rights of ownership over such resources," while "[a]rchaeological resources excavated or removed from the public lands remain the property of the

---

[6] *See* Brugge & Wilson, *supra* note 4.

United States." 43 C.F.R. § 7.13(a)–(b). ARPA requires an agency to notify Indian tribes of possible harm to or destruction of sites the tribe may consider to have religious or cultural importance. *Id.* § 470cc(c). Further, ARPA gives the Secretary of the Interior authority to "promulgate regulations providing for . . . the ultimate disposition" of "archaeological resources removed from public lands and Indian lands" and provides that the "ultimate disposition under such regulation of archaeological resources excavated or removed from Indian lands shall be subject to the consent of the Indian or Indian tribe which owns or has jurisdiction over such lands." 16 U.S.C. § 470dd.

It is uncontested that 297 of the 303 sets of remains and objects were removed without the Nation's consent, but the complaint alleges that in the 1980s the Navajo Nation consented to the Park Service's disinterment of six sets of remains from grave sites being eroded, on the condition that they be reinterred immediately.[7] Instead, according to the complaint, the Park Service took the remains and added them to its collection at the Western Archeology Conservation Center in Tucson, Arizona.

In 1990, Congress enacted the Native American Graves Protection and Repatriation Act (NAGPRA). *See* 25 U.S.C. §§ 3001–3013. Section 3003 of NAGPRA states:

> Each Federal agency and each museum which has possession or control over holdings or

---

[7] The Park Service denies that it agreed to immediately reinter the remains. But in reviewing the district court's order granting a motion to dismiss, we accept the complaint's allegations as true. *See Bill v. Brewer*, 799 F.3d 1295, 1299 (9th Cir. 2015).

> collections of Native American human remains and associated funerary objects shall compile an inventory of such items and, to the extent possible based on information possessed by such museum or Federal agency, identify the geographical and cultural affiliation of such item.

25 U.S.C. § 3003(a).**[8]**   The inventory must include a description of each set of items, the geographical and cultural affiliation of the items, information regarding the acquisition and accession of the items, and a summary of the evidence used to determine the cultural affiliation of the items.   43 C.F.R. § 10.9(a), (c).   "The purpose of the inventory is to facilitate repatriation by . . . establishing the cultural affiliation between these objects and present-day Indian tribes . . . ."   *Id.* § 10.9(a).   To that end, in creating the inventory, the agency must consult with any tribes likely to be geographically or culturally affiliated with the items. 25 U.S.C. § 3003(b); 43 C.F.R. § 10.9(b).   The consultation process is a tribe's opportunity to voice its reasons for seeking repatriation of the items.   *See* 43 C.F.R. § 10.9(b)–(c).   If the inventory process establishes an item's "known lineal descendant" or "cultural affiliation" with an Indian tribe, then the agency must "expeditiously return" the item upon request.   25 U.S.C. § 3005(a)(1).

Before NAGPRA's enactment, the Secretary of the Interior did not promulgate regulations providing for the ultimate disposition of any resources excavated or removed pursuant to ARPA. *See* Archaeological Resources Protection

---

**[8]** A separate provision governs the disposition of items excavated or discovered after NAGPRA's enactment.  *See* 25 U.S.C. § 3002.

Act of 1979; Final Uniform Regulations, 49 Fed. Reg. 1,016, 1,032 (Jan. 6, 1984).  After Congress passed NAGPRA, the Secretary promulgated regulations providing that NAGPRA governs the ultimate disposition of any remains and items covered by both NAGPRA and ARPA.  *See* 43 C.F.R. § 7.3(a)(6) ("For the disposition following lawful removal or excavations of Native American human remains and 'cultural items', as defined by [NAGPRA], the Federal land manager is referred to NAGPRA and its implementing regulations."); *Id.* § 7.13(e) ("[T]he Federal land manager will follow the procedures required by NAGPRA and its implementing regulations for determining the disposition of Native American human remains and other 'cultural items', as defined by NAGPRA, that have been excavated, removed, or discovered on public lands.").

In the mid-1990s, the Park Service began the NAGPRA inventory process for the remains and objects it removed from Canyon de Chelly National Monument.  As part of this process, the Park Service began consulting with the Navajo Nation and the Hopi and Zuni Pueblos.[9]  Shortly thereafter, in June 1996, the Navajo Nation sent a letter to the Superintendent of Canyon de Chelly National Monument asserting that it owned "all human remains and associated funerary objects within the National Monument," and objecting to the inventory process.  The Park Service replied by letter stating that it would "handle all . . . requests for repatriation in strict accordance with the NAGPRA" and

---

[9] The Navajo did not populate the Canyon de Chelly region in significant numbers until around 1700.  Before then, predecessors to the modern Hopi and Pueblo occupied the region.  Nat'l Park Serv., *supra* note 1.

encouraging the Navajo Nation to participate in the inventory process.

The Navajo Nation participated, but it did so under protest.[10]  Although the record is sparse, it shows that the Navajo Nation engaged in ongoing dialogue with the Park Service regarding the Nation's objections to the NAGPRA process and claims of ownership, and in 2007 the Park Service withdrew a draft inventory.  Due to the continuing disagreement between the Park Service and the Navajo Nation, the Department of the Interior, of which the Park Service is a bureau, sought an opinion from its Office of the Solicitor.  In an April 2010 email, the Park Service informed the Navajo Nation that Interior's solicitor determined the Park Service "must comply with NAGPRA" and continue to inventory the remains and objects taken from Canyon de Chelly National Monument.  In a June 2011 inventory consultation meeting between the Park Service and various tribes, the Park Service restated the determination made by Interior's solicitor that the Park Service must "do NAGPRA on Canyon de Chelly cultural resources."  The Navajo Nation asked for a copy of the opinion, but the Park Service responded that Interior's solicitor "did not supply an official opinion," the opinion was "informally given," and Interior would not issue any more opinions on the subject.  The Navajo Nation sent a letter to the Park Service on August 9, 2011, stating its intent to sue if the Park Service did not cease the inventory process and immediately return the remains and objects.  The Park Service responded with a letter, signed by

---

[10] The Navajo continued to seek the immediate return of the objects consistent with their belief that exhumation "causes illness[,] . . . damages crops, natural ecosystems and the environment, and disrupts local and global weather patterns."

the Superintendent of Canyon de Chelly National Monument, that cited the same opinion from Interior's solicitor and reiterated the position that the Park Service was "required by law to complete the NAGPRA process for cultural items excavated or removed from lands within" Canyon de Chelly National Monument. By the time this letter was received, the inventory process had been ongoing for approximately fifteen years.

In December 2011, the Navajo Nation sued the Park Service. The complaint alleged that the Park Sevice's refusal to immediately return the remains and objects violated the Treaty of 1849, the Treaty of 1868, NAGPRA, ARPA, the Administrative Procedure Act (APA), and the Fifth Amendment to the United States Constitution. The district court ruled that there had been no final agency action under the APA, and it dismissed the suit as barred by sovereign immunity. The Navajo Nation appealed.

## STANDARD OF REVIEW

This court reviews de novo a district court's dismissal for lack of subject matter jurisdiction. *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012).

## DISCUSSION

"The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941) (citations omitted). The Administrative Procedure Act (APA) creates a comprehensive remedial scheme for those allegedly harmed by agency action. *See* 5 U.S.C.

§§ 701–706.  Section 702 of the APA waives sovereign immunity for suits alleging wrongful agency action or inaction.  *Id.* § 702.  It states:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States . . . .

*Id.*  Section 704 of the APA provides a right to judicial review of any "final agency action for which there is no other adequate remedy in a court."  *Id.* § 704.

The Park Service argues that the district court correctly dismissed all claims for lack of jurisdiction because the Park Service has not taken final agency action as to the disposition of the remains and objects removed from Canyon de Chelly.  In other words, the Park Service contends that the Navajo Nation seeks to interrupt the inventory process before the Park Service has determined which tribe is culturally affiliated with the remains and objects.  The Navajo Nation counters that the Park Service's decision that NAGPRA applies to the remains and objects was a final agency action because that decision triggered the inventory process and deprived the Navajo Nation of property rights the Nation claims to enjoy under ARPA and various treaties.

We hold that the decision to apply NAGPRA to the remains and objects constituted final agency action because it was the consummation of the Park Service's decisionmaking process regarding which statutory scheme would apply to determine the Navajo Nation's property interests in the remains and objects, and significant legal consequences flow from the decision. Accordingly, we reverse the district court's judgment and remand for consideration of the Navajo Nation's claims challenging the applicability of NAGPRA.

In *Bennett v. Spear*, the Supreme Court stated two requirements for determining what constitutes a final agency action under the APA. *See* 520 U.S. 154, 177–78 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process . . . ." *Id.* (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

As to the first *Bennett* requirement, an agency's determination of its jurisdiction is the consummation of agency decisionmaking regarding that issue. In *Fairbanks North Star Borough v. U.S. Army Corps of Engineers*, the Army Corps of Engineers determined that a tract of land contained "waters of the United States" requiring the landowner to receive a permit from the Corps before developing the land. 543 F.3d 586, 589–90 (9th Cir. 2008). We held that because there would be "[n]o further agency decisionmaking" as to the presence of jurisdictional wetlands on the property, the jurisdictional decision "mark[ed] the

consummation of the agency's decisionmaking process as to that issue." *Id.* at 593.

Similarly here, the Park Service's legal determination that NAGPRA's inventory requirements apply to the remains and objects from Canyon de Chelly "mark[ed] the consummation of the agency's decisionmaking process as to that issue." *Id.* In response to the Navajo Nation's inquiries, the Park Service sent the Navajo Nation an email notifying it that Interior's solicitor determined the remains and objects to be subject to NAGPRA's inventory requirements. During an in-person meeting, a Park Service official declined to provide a copy of the informal opinion and made clear that no additional decisionmaking would be forthcoming. The Park Service refused the Navajo Nation's request for a formal, written opinion, replying that Interior's solicitor's opinion was "informally given" and "[t]hat was the opinion they gave." On August 9, 2011, the Navajo Nation sent a letter to the Park Service again requesting formal resolution of its request for return of the items. In a letter dated September 7, 2011 and signed by the Superintendent of Canyon de Chelly National Monument, the Park Service issued its final response to the demands of the Navajo Nation.

This written decision cited the prior opinion from Interior's solicitor and denied the Navajo Nation's claim that all the remains and objects be returned to the Navajo Nation because they belonged to them by virtue of when and where the remains were excavated. This communicated that the objects collected before NAGPRA's effective date would not be returned prior to completion of the NAGPRA inventory process, which necessarily meant that some of the remains and objects might never be returned to the Navajo Nation, that the six sets disinterred after the enactment of ARPA

would be subjected to the inventory process rather than being immediately reinterred, and that no further explanation would be forthcoming regarding NAGPRA's applicability.

On this record, we have no trouble concluding that the decision to follow Interior's solicitor's guidance and continue inventorying the remains and objects consummated the Park Service's decisionmaking process as to the applicability of NAGPRA. The dissent argues that the first *Bennett* requirement is not satisfied because the Park Service is still in the process of determining cultural affiliation of the remains and objects pursuant to NAGPRA, overlooking that the Navajo Nation argues that NAGPRA's statutory scheme does not apply to these objects at all. Contrary to the dissent's further assertions, we do not conclude that the Park Service's informal request to its lawyers for legal advice regarding NAGPRA's applicability was a final agency action. Nor do we hold that delay and expense transform an interlocutory decision into final agency action. It is the agency's decision to apply NAGPRA to these remains and objects that constituted a final agency action.

The Park Service decision also meets the second *Bennett* requirement because the decision determined the Navajo Nation's legal rights in the remains and objects, and legal consequences flow from the decision. A federal agency's decision to apply NAGPRA is the agency's legal determination of its property rights in the relevant objects. Under NAGPRA, the Park Service can only inventory the remains and objects if it has "possession or control" over them. 25 U.S.C. § 3003(a). As the district court recognized, NAGPRA's implementing regulations specify that possession means "having physical custody . . . *with a sufficient legal interest* to lawfully treat the objects as part of its collection

. . . ." 43 C.F.R. § 10.2(a)(3)(I) (emphasis added).  Similarly, control means "having *a legal interest* . . . sufficient to lawfully permit the . . . Federal agency to treat the objects as part of its collection . . . ."  *Id.* § 10.2(a)(3)(ii) (emphasis added).  The regulations clarify that control may exist "whether or not the [objects] are in the physical custody of the . . . Federal agency." *Id.*

The Navajo Nation contends that because its 1868 treaty provides it with the "exclusive use and occupation" of Canyon de Chelly, it owns the remains and objects that the Park Service hopes to inventory.  The Nation further argues that the creation of the monument and the adoption of ARPA reaffirm its ownership interest in the remains and objects and that the Park Service has no legal interests sufficient to trigger NAGPRA's application.

In correspondence with the Navajo Nation, the Park Service asserted that Interior's solicitor determined that the Park Service has "legal possession AND control under NAGPRA."  Though the Park Service declined to provide a copy of the solicitor's opinion, its decision to apply NAGPRA necessarily determined at least some of the Navajo Nation's property rights in the remains and objects.

The district court ruled that the Monument Act granted the Park Service possession and control of the remains and objects sufficient to trigger NAGPRA's inventory process, but NAGPRA applies only if the Park Service has legal possession or control over the remains and objects.  *See* 43 C.F.R. § 10.2(a)(3)(I)–(ii).  For example, if remains and objects were loaned to the Park Service, the regulatory scheme dictates that the Park Service would have no legal right of possession for purposes of NAGPRA.  *See id.*

§ 10.2(a)(3)(I).  It follows that the Park Service's unexplained decision to apply NAGPRA to the remains and objects necessarily forecloses the Nation's argument that it has complete ownership of the remains and objects pursuant to its treaty rights, and that the Monument Act and ARPA only reaffirm its ownership interest.  Further, as to the six sets of remains disinterred after enactment of ARPA, the Park Service's decision that it had a legal interest sufficient to lawfully permit it to treat the objects as part of its collection for purposes of NAGPRA denied the Nation's claim that these sets were removed with its permission and on the condition that they be immediately reinterred.  Thus, the decision to apply NAGPRA determined the Nation's legal interests in these remains, and legal consequences flowed from the decision.  Under *Bennett*, this decision constituted final agency action.

The dissent asserts that the Park Service's decision to apply NAGPRA did not determine any legal rights, implying that the regulatory definitions of the terms "possession" and "control" apply only to museums.  Not so.  By their own terms, the definitions apply to federal agencies.  *See* 43 C.F.R. § 10.2(a)(3)(I) (explaining that "a museum *or Federal agency* would not be considered to have possession" of objects on loan' (emphasis added)); *id.* § 10.2(a)(3)(ii) (defining control as "having a legal interest . . . sufficient to lawfully permit the museum *or Federal agency* to treat the objects as part of its collection" (emphasis added)).  This reading is entirely consistent with the Park Service's own interpretation of the regulations.[11]

---

[11] *See NAGPRA Glossary*, Nat'l Park Serv., http://www.nps.gov/nagpra/TRAINING/GLOSSARY.HTM (last visited Mar. 9, 2016) (quoting 43 C.F.R. § 10.2(a)(3)(i)–(ii)).

The definitions of possession and control appear in a subsection of the implementing regulations that address who must comply. *Id.* § 10.2(a). After defining "Federal agency," "Federal agency official," and "Museum," the regulation defines "possession" and "control" in separate subparagraphs. *Id.* § 10.2(a)(1)–(3). In other paragraphs of this definitions section, where the drafters wanted a subparagraph to apply only to the term defined in the immediately preceding paragraph, the drafters so indicated with a colon. *See id.* § 10.2(d)(2), (f)(2), (g)(5). By contrast, the definition of "museum" concludes with a period. *See id.* § 10.2(a)(3). The only way to read this structure consistently with the rest of the regulation is to read "possession" and "control" to apply to "Federal agency," "Federal agency official," *and* "Museum." *See generally*, Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 161–65 (2012) ("Punctuation is a permissible indicator of meaning."). Finally, the dissent's interpretation would read the statute as using the words "possession" and "control" to mean *lawful* possession and control when applied to museums but mean only *physical* possession and control when applied to federal agencies. Nothing in the regulatory scheme suggests this result. *See id.* at 170–73 ("A word or phrase is presumed to bear the same meaning throughout a text.").

The dissent also asserts that because the NAGPRA inventory process provides a method for determining ultimate ownership of remains and objects, an Indian tribe's property interests in the remains and objects may only be determined at NAGPRA's conclusion. We read the sequence of events in NAGPRA's statutory scheme similarly as the dissent. But the dissent's position assumes away the threshold question of whether NAGPRA's statutory scheme applies in the first place. Here, the Navajo Nation asserts a superior property

interest in the remains and objects deriving from treaties and statutes that predate NAGPRA. We do not prejudge whether the Nation's attacks on NAGPRA's applicability are correct, we merely hold that the district court had jurisdiction to consider them.

The dissent argues that Congress did not intend an agency to make a legal determination of possession and control as a part of the NAGPRA process. We agree. But because the Navajo Nation has challenged the invocation of the NAGPRA process, it is incumbent on the court to determine NAGPRA's applicability. Congress was clear that NAGPRA's inventory requirements only apply to "[e]ach Federal agency and each museum which has possession or control" over remains and objects. 25 U.S.C. § 3003(a). Section 10.2 of NAGPRA's implementing regulations answers the question "[w]ho must comply with these regulations?" by defining "Federal agency" and the terms "possession" and "control." 43 C.F.R. § 10.2(a). The Park Service's threshold determination that NAGPRA applies is subject to judicial review.

The dissent separately argues that the Park Service's decision to apply NAGPRA does not satisfy the second *Bennett* factor because the Navajo Nation could simply choose not to participate in the NAGPRA process.[12] But

---

[12] Relatedly, the dissent argues the Navajo Nation's claims can be vindicated at the conclusion of NAGPRA and that the Nation will be made whole if the remains and objects are eventually returned. This is only partially correct. As explained, the remains and objects are sacred and their continued disinterment is alleged to cause unique harm. Further, the regulation the dissent cites for the proposition that superior property rights can only be asserted at the conclusion of the NAGPRA process, 43 C.F.R. § 10.11(e), states that district courts may hear "any action brought that

NAGPRA requires the Park Service to complete its inventories "in consultation with tribal government[s]," 25 U.S.C. § 3003(b)(1)(A), and to seek information from tribes, including contact information for traditional religious leaders and information about the "[k]inds of objects that the [tribe] reasonably believes to have been made exclusively for burial purposes or to contain human remains of their ancestors." 43 C.F.R. § 10.9(b)(4)(ii)–(iii). Here, the Park Service has had several in-person meetings with tribal officials to attempt to determine cultural affiliation of the remains and objects. The dissent's suggestion that the Nation forego the right to consultation and attack the NAGPRA process at its conclusion overlooks that by sitting on the sidelines, the Nation would miss its best opportunity to establish that the remains and objects are culturally affiliated with the Navajo if the inventory process goes forward. The dissent also overlooks the Navajo Nation's assertion that it suffers a continuing harm as long as the remains are disinterred and not returned to their tribal lands.

The Park Service argues that the Navajo Nation's claims are unripe and that the Navajo Nation failed to exhaust administrative remedies because the NAGPRA inventory process is still ongoing, and the Park Service has not yet decided which of the remains is culturally affiliated with which tribe. But the Park Service's argument is built on the flawed premise that the Navajo Nation asserts only that the remains should be repatriated to it pursuant to NAGPRA. In fact, the Navajo Nation claims that NAGPRA does not apply at all because the Navajo Nation, and not the Park Service, has the right to immediately possess and control the remains

_____

alleges a violation of [NAGPRA]." It says nothing about when such an action may be brought.

and objects. The Navajo Nation asserts that this right to immediate possession and control flows from the Navajo Nation's treaty right to "exclusive use and occupation" of Canyon de Chelly. The Navajo Nation further asserts that both the 1931 Act creating Canyon de Chelly National Monument and ARPA confirm its right to immediate possession and control.

Determining whether an agency's decision is ripe for review "requir[es] us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977). Here, the Park Service's continued possession of the remains and objects exacts a unique and significant hardship on the Navajo Nation. The Navajo believe that exhumation "causes illness[,] . . . damages crops, natural ecosystems and the environment, and disrupts local and global weather patterns." By suing for return of the remains, the Navajo Nation seeks to end the Park Service's longstanding "exercise [of] dominion and control over these remains and objects, among the most sacred of the Nation's property." The question of NAGPRA's application is fit for review because it is a purely legal question applied to discrete facts and significant legal consequences flow from the decision. *See id.*

Further, the Navajo Nation *has* exhausted all available administrative remedies for seeking review of the decision to apply NAGPRA and for obtaining possession of the remains and objects. In the fifteen years prior to filing suit, the Navajo Nation repeatedly demanded an explanation of the Secretary's decision that NAGPRA applies, as well as return of the remains and objects. Their efforts yielded only

correspondence reporting that Interior's solicitor opined that NAGPRA applies to the remains and objects, and that no further opinion will be provided by the agency.

Because both prongs of the *Bennett* test are met, we reverse the district court's order and remand for review of the Navajo Nation's claims challenging the applicability of NAGPRA.[13]

**REVERSED and REMANDED.**

IKUTA, Circuit Judge, dissenting:

Congress mandated that the National Park Service (Park Service) follow a process for identifying which tribes are entitled to receive the human remains and archeological artifacts removed from the Canyon de Chelly. That process, codified in the Native American Graves Protection and Repatriation Act (NAGPRA), provides for repatriation of human remains and associated artifacts to their known descendants. *See* 25 U.S.C. §§ 3001–3013. The Park Service is slowly implementing the NAGPRA process with respect to the human remains and artifacts in its possession. Its snail-like progress is in part attributable to the ongoing resistance of the Navajo Nation, which objects to Congress's process,

---

[13] Our decision moots the Navajo Nation's remaining jurisdictional arguments. We need not decide whether the Park Service "unlawfully withheld" agency action within the meaning of 5 U.S.C. § 706(1). Nor do we decide whether Congress waived sovereign immunity as to non-APA claims challenging intermediate agency actions. *See Gros Ventre Tribe v. United States*, 469 F.3d 801, 809 (9th Cir. 2006).

and has filed suit against the Park Service for an immediate declaration that it owns all the human remains and artifacts that were removed from the Canyon.  Although the Navajo Nation may be frustrated, a federal court cannot hear such an action unless the United States has waived its sovereign immunity under § 704 of the Administrative Procedure Act (APA),[1] which makes reviewable a "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704; Maj. op. at 13–14.

Despite the fact that the Park Service has not even come close to taking a final agency action, today the majority decides to take matters into its own hands.  It selects virtually at random one of the many steps in the Park Service's ongoing effort and claims it constitutes a final agency action, Maj. op. at 16–17.  Because this decision is contrary to both the APA and our precedents, I dissent.

I

The Park Service's slow-motion implementation of the NAGPRA process mirrors the long history of the Canyon de Chelly.  The Canyon has been inhabited by humans for nearly 4,500 years and has been home to permanent settlements for about 2,000 years. Starting around 750 A.D. the Canyon became home to the ancient Pueblo, sometimes referred to as the Anasazi.  The ancient Pueblo remained in the Canyon until about 1300, when they left to seek better farmlands. Their descendants, the Hopi Indians, continued to live in the Canyon until about 1600.  The modern Zuni and Hopi Indians

---

[1] Because the majority focuses on § 704 of the APA, I do not address whether the Navajo Nation could maintain its action under 5 U.S.C. § 702.

are the descendants of the ancient Pueblo.　The Navajos are relative newcomers, arriving at the Canyon around 1700.

The federal government's involvement in the collection and preservation of human remains and artifacts from the Canyon de Chelly dates back to 1906, when the Antiquities Act, 54 U.S.C. § 320302 (1906), authorized federal agencies to issue permits for the excavation and collection of archaeological artifacts so long as they were preserved in public museums.　Under the authority of this act, the Park Service removed and preserved some 297 sets of human remains from the Canyon de Chelly.　In 1979, the Archaeological Resources Protection Act (ARPA), 16 U.S.C. §§ 470aa–470mm (1979), added new permit requirements, and the Park Service removed an additional six sets of remains pursuant to a federal permit.　In all, the Park Service removed 303 sets of remains from the Canyon before NAGPRA was enacted in 1990.　The Park Service preserved all 303 sets of remains at the Western Archaeology Conservation Center in Tucson, Arizona.

It was not until 1990 that Congress enacted NAGPRA, which "provides a framework for establishing ownership and control of (1) newly discovered Native American remains and funerary objects (collectively 'cultural items') and (2) cultural items already held by certain federally funded museums and educational institutions." *White v. Univ. of Cal.*, 765 F.3d 1010, 1016 (9th Cir. 2014) (citing 25 U.S.C. §§ 3001–3013); *see also* 43 C.F.R. § 10.1.　With respect to pre-existing collections of human remains and artifacts, NAGPRA requires federal agencies and museums with "possession or control over [such] holdings or collections" to "compile an inventory" of the items and "identify the geographical and cultural affiliation of such item[s]" where possible. 25 U.S.C.

§ 3003(a). Once the federal agency or museum has identified the cultural affiliation of the object, it must notify the affected tribes and publish a public notice in the Federal Register. *Id*. § 3003(d).

After the cultural affiliation process is complete, Native American human remains and associated artifacts must be expeditiously repatriated to "a known lineal descendant of the Native American" or of the affected tribe, upon request of that descendant or tribe. *Id*. § 3005(a)(1). Other cultural artifacts may be returned to individuals or tribes that "owned or controlled" the items. *Id*. § 3005(a)(5). An agency may retain artifacts only if it has the "right of possession," meaning that the items were "obtained with full knowledge and consent of the next of kin or the official governing body" of the relevant tribe. *Id*. §§ 3001(13), 3005(c).

The regulations provide a robust dispute resolution process to address disagreements about the implementation of NAGPRA or the disposition of cultural artifacts. A federal agency's "final denial of a request . . . for the repatriation or disposition of human remains [and cultural objects] brought under, and in compliance with [NAGPRA] constitutes a final agency action under the Administrative Procedure Act (5 U.S.C. 704)." 43 C.F.R. § 10.1(b)(3). When there are multiple requests for repatriation, and the competing claimants cannot resolve their dispute through informal negotiations, they may bring an action in district court. *Id*. §§ 10.10(c)(2), 10.11(e), 10.17. Further, a party claiming legal property rights to the human remains or artifacts that supersede NAGPRA can vindicate those claims in court. *Id*. § 10.11(e)(3).

As mandated by NAGPRA, the Park Service started the inventory process for all 303 sets of remains in the mid-1990s. Pursuant to § 3003(a), the Park Service began consulting with the Navajo Nation, Hopi, and Zuni regarding the cultural affiliation of the remains. 25 U.S.C. § 3003(b)(1)(A). By 1996 the Park Service had compiled a draft inventory, which it shared with the participating tribes. The draft inventory identified some of the remains as belonging to ancestral Puebloans. Under NAGPRA, such a finding would generally require the Park Service to return the remains to the Hopi and Zuni Tribes, the known lineal descendants of the Puebloans, upon their request. *Id*. § 3005(a).

After the Park Service circulated the draft inventory, the Navajo Nation objected to the NAGPRA process and claimed that all "human remains and funerary objects" found in the Canyon de Chelly are "property of the Navajo Nation" by virtue of the Navajo's land ownership. The Park Service stated it would respond to "any requests for repatriation in strict accordance with the NAGPRA." This response did not satisfy the Navajo Nation. Faced with the Navajo Nation's resistance, the Park Service put the inventory process on hold.

In 2010, the Park Service asked lawyers at the Division of Parks and Wildlife and Division of Indian Affairs for advice. The Park Service's lawyers informally confirmed that for purposes of NAGPRA, the Park Service had possession and control of the items that had been removed from the Canyon de Chelly and that these archeological resources were not exempt from NAGPRA's repatriation procedures. Therefore, according to the lawyers, the Park Service was bound to comply with the procedure set forth in the statute and regulations. This advice was provided informally; the Park

Service later explained that it takes at least three years to obtain an official legal opinion.  In June 2011, the Park Service informed the Navajo Nation about the informal advice of its lawyers and its intention to move forward with the NAGPRA process.

Two months later, the Navajo Nation sent a formal demand letter to the Park Service and threatened to sue unless the Park Service turned over all human remains and artifacts to the Navajo Nation immediately.  In its response on September 7, 2011, the Park Service stated that its position remained that it was required by law to complete the NAGPRA process.  It hoped that the Navajo Nation would develop an agreement with the Hopi and Zuni Pueblo tribes so that they "would have more consistent input into the [Park Service's] final decision" regarding repatriation of the remains.  The letter also stated the Park Service's hope that the Navajo Nation would not engage in litigation, which would cause further delays.  The Park Service concluded by stating that it continued "to believe that we can work through our differences in a cooperative and collaborative manner." The Navajo Nation then initiated this lawsuit.

II

A review of the applicable law makes clear that no event in the Park Service's implementation of NAGPRA to date constituted a final agency action.

To be final for purposes of § 704, an agency action must satisfy two requirements.  First, the agency action "must mark the 'consummation' of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)

(internal citation omitted).  Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id*. at 178 (internal quotations omitted).  The elements of both *Bennett* prongs have been clearly delineated.

For an action to "mark the consummation of the agency's decisionmaking process" under the first *Bennett* prong, there must be an established "formal procedure," *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 592–93 (9th Cir. 2008), in which the agency "evaluate[s] the merits of [the issue] to arrive at a reasoned, deliberate decision," *see ONRC Action v. Bureau of Land Management*, 150 F.3d 1132, 1136 (9th Cir. 1998).  A final decision must establish an official position that is "considered, definite and firm," *Fairbanks*, 543 F.3d at 593, and constitutes the agency's "last word on the matter," *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006).  A federal agency's informal recommendation or assessment is not a final agency action.  *See City of San Diego v. Whitman*, 242 F.3d 1097, 1101–02 (9th Cir. 2001); *Aminoil U.S.A., Inc. v. Cal. State Water Res. Control Bd.*, 674 F.2d 1227, 1231 (9th Cir. 1982).  Nor is an agency's notice of its plans to make a decision in the future.  *See Gen. Atomics v. U.S. Nuclear Regulatory Comm'n*, 75 F.3d 536, 540 (9th Cir. 1996); *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 263–64 (9th Cir. 1990).  As a practical matter, this means that final agency decisions are virtually always written and generally published.  *See, e.g.*, *Sackett v. EPA*, 132 S. Ct. 1367, 1370–72 (2012) (formal, written EPA compliance order); *Or. Nat. Desert Ass'n*, 465 F.3d at 979–80 (written annual operating instructions, which functioned as a grazing permit, issued to Forest Service permit holders); *Bennett*, 520 U.S. at

177–78 (written Biological Opinion provided by the Fish and Wildlife Service).

To satisfy the second *Bennett* prong, an agency's decision must have the force and effect of law and be binding on the plaintiff. The decision must require the plaintiff to do or forbear from some action, s*ee Fairbanks*, 543 F.3d at 593, such that the plaintiff's only choice is whether to comply with or defy a legal requirement, *see FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239–40 (1980). An expression of the agency's view regarding what the law requires is not enough, *Fairbanks*, 543 F.3d at 594, nor is a decision that a statute applies to an activity or individual, *see Hale v. Norton*, 476 F.3d 694, 697 (9th Cir. 2007) (holding that a Park Service decision that landowners were subject to permit requirements was not a final agency action under *Bennett*); *Hecla Mining Co. v. EPA*, 12 F.3d 164, 165–66 (9th Cir. 1993) (holding that the decision to include a river and mine on the lists subjecting them to permit requirements "is not the final agency action necessary to state a cause of action under § 704 of the APA").

Further, the agency's decision must have legal and not merely practical consequences. It is well established that agency actions subjecting the plaintiff to a "greater risk of increased fines," an "onerous administrative maze," or further agency proceedings are not final, as these are practical effects, not legal consequences. *Fairbanks*, 543 F.3d at 595–96. Even an agency decision that causes immediate financial impacts or triggers profound economic consequences is not final under the second *Bennett* prong, as these too are merely practical effects. *See id*. Rather, an agency's decision is final if it has tangible legal consequences

or otherwise alters the legal relationship between the parties. *Id.* at 594.

### III

The Park Service's continuation of the NAGPRA inventory process meets neither of the *Bennett* prongs and so is not a final agency action.

First, there has been no "consummation" of any decisionmaking process. The majority asserts that "the [Park Service's] decision to apply NAGPRA to these remains and objects . . . constituted a final agency action." Maj. op. at 17. But the Park Service decided that NAGPRA was applicable to its 303 sets of remains two decades ago, when it commenced the NAGPRA process. The Park Service's long-ago decision to comply with NAGPRA did not mark the "consummation" of any decisionmaking process, but rather its beginning. *See Hale*, 476 F.3d at 697; *Hecla Mining Co.*, 12 F.3d at 165–66 (holding that an agency's decision to initiate regulatory proceedings does not constitute a final agency action because it is "merely preliminary").

Nor did the Park Service's 2010 request to its lawyers for confirmation that NAGPRA applied constitute a final determination of the Park Service's jurisdiction. The informal request occurred some 15 years after the Park Service began applying NAGPRA, and merely represented the continuation of the NAGPRA process. *See ONRC Action*, 150 F.3d at 1136. Indeed, if an agency is deemed to take a "final agency action" every time it asks its lawyers whether it is following the law, agencies will either be subject to challenge regarding every internal, interlocutory decision—or will have to banish government lawyers from every

government building.  The Supreme Court rejected such a result in *Bennett*, holding that it was "loathe" to permit review of every procedural step taken by an agency, especially those "that had not yet resulted in a final disposition of the matter at issue."  520 U.S. at 174. Likewise, the Park Service's September 2011 letter to the Navajo Nation merely reiterated that "[t]he position of the [Park Service] and the advice of our solicitors . . . *remains* that we are required by law to complete the NAGPRA process." (emphasis added).  While the majority characterizes this letter as a "final response to the demands of the Navajo Nation," Maj. op at 16, nothing in the letter suggests it is anything more than another response in the ongoing dialogue with the Navajo Nation.

In short, no case identified by the Navajo Nation or the majority comes close to suggesting that an agency's decision to stay the course, bolstered by informal advice from counsel, constitutes the "consummation of the agency's decisionmaking process."[2]  There is nothing in the record resembling the formal Biological Opinion at issue in *Bennett*, 520 U.S. at 177, or the written grazing permit addressed in *ONDA*, 465 F.3d at 980.  There is thus no support for the majority's claim that the Park Service's decision to continue with the NAGPRA process after obtaining its lawyers' advice marked the consummation of the Park Service's

---

[2] The Navajo Nation argues that *Bonnichsen v. United States* is such a case.  367 F.3d 864 (9th Cir. 2004).  Its reliance is misplaced because that opinion did not address whether the decision to apply NAGPRA to remains that were possibly non-Indian was a final agency action.  Rather, the issue of finality was decided by the district court and not appealed. *See Bonnichsen v. U.S. Dept. of the Army*, 969 F. Supp. 628, 637–38 (D. Ore. 1997).

decisionmaking process regarding its jurisdiction.  Maj. op. at 16–17.

The second *Bennett* factor is also lacking here.  The Park Service's decision to proceed with the NAGPRA process does not impose any obligation on the Navajo Nation, and so is not "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks and punctuation omitted).  The Navajo Nation is not put to the choice of compliance or defiance with any requirement, *see Standard Oil*, 449 U.S. at 239–40; rather, it is free to decline to participate in the inventory process.  *See* 25 U.S.C. § 3003(b); 43 C.F.R. § 10.9(b).[3]  The Park Service's decision to move forward may indeed have practical effects, in that it will delay vindication of the Navajo Nation's alleged entitlement to the human remains and artifacts and will impose some costs if the Navajo Nation chooses to participate in the NAGPRA process.  And while the Navajo Nation's decision not to participate in the NAGPRA process may also have practical effects, *see* Maj. op. at 21–22, a practical burden is not a legal burden, and any additional delay and expense are insufficient to make an agency decision final even if they turn out to be quite substantial.  *See Standard Oil*, 449 U.S. at 242 ("Although [the burden of responding to agency enforcement] certainly is substantial, it is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action.").

---

[3] While NAGPRA requires that the Park Service seek to consult with tribal governments during the cultural affiliation process, *see* Maj. op. at 21–22; 25 U.S.C. § 3003(b)(1)(A); 43 C.F.R. § 10.9(b)(4), nothing in NAGPRA requires the Navajo Nation to cooperate.

The majority claims that the Park Service's decision to continue with the NAGRPA inventory process "necessarily meant that some of the remains and objects might never be returned to the Navajo Nation," Maj. op. at 16, and "necessarily forecloses the Nation's argument that it has complete ownership of the remains and objects pursuant to its treaty rights," Maj. op. at 19. The majority is simply mistaken. Once the NAGPRA process is complete, the Navajo Nation will be free to raise all the claims it brings today—including its challenges to the disposition of the human remains and artifacts, its claim that the Park Service breached an agreement to re-inter six sets of remains, *see* Maj. op. at 19, and its argument that it has legal property rights in the items that supersede the NAGPRA process. *See* 43 C.F.R. §§ 10.10(c)(2); 10.11(e).[4]

The majority's theory that the Park Service made a reviewable "threshold determination" of its property rights in the remains and artifacts before applying NAGPRA, Maj. op. at 19–21, is completely backwards. Neither NAGPRA nor its implementing regulations require a federal agency to formally and finally determine whether it has "possession or control over" Native American artifacts before instituting the NAGPRA process. *See* 25 U.S.C. § 3003; 43 C.F.R. § 10.2.

---

[4] The majority mischaracterizes 43 C.F.R. § 10.11(e) by claiming that it "says nothing about when such an action may be brought." Maj. op. at 21–22 n.12. By its own terms, § 10.11 applies to disputes "regarding the *disposition* of culturally unidentifiable human remains and associated funerary objects," 43 C.F.R. § 10.11(e) (emphasis added), that arise after the NAGPRA inventory process is complete, *id*. § 10.11(a) ("This section . . . applies to human remains previously determined to be Native American under § 10.9, but for which no lineal descendant or culturally affiliated Indian tribe or Native Hawaiian organization has been identified.").

To the contrary, it is a federal agency's decision that NAGPRA is *not* applicable which is deemed to be a final agency action subject to review. 43 C.F.R. § 10.1(b)(3). An agency's decision that it has the requisite possession and control of human remains and artifacts to apply NAGPRA is not final or reviewable until after the inventory process is complete. *See id*. §§ 10.1(b)(3), 10.10(c). Nor can we infer that Congress intended an agency to make a formal determination of its legal rights to human remains and artifacts before applying NAGPRA. Congress knew how to require a determination of ownership rights when it wanted one, as NAGPRA expressly provides guidance for determining the "ownership or control" of Native American cultural items excavated after 1990, 25 U.S.C. § 3002(a), and establishes a process for determining whether agencies or museums have a "right of possession" to objects in their collections, *id*. § 3005(c). Both of these determinations are made at the end of the NAGPRA process, along with all the other repatriation decisions. Nothing in NAGPRA requires the threshold determination that the majority relies on, and Congress's omission of such a provision indicates that it did not want any such threshold determination to occur.

The majority nonetheless claims that § 10.2 of the regulations requires the Park Service to ascertain whether it has a legal interest in the remains or artifacts before it starts the NAGPRA process. Maj. op. at 19–21. By its terms, however, § 10.2 merely defines the term "museum," and provides a safe harbor for museums that have borrowed cultural items from a third party.[5] The applicability of this

---

[5] Section 10.2 answers the question "Who must comply with these regulations?" as: "federal agency," "federal agency official," and "museum." 43 C.F.R. § 10.2(a)(1)–(3). "Museum" is defined as "any

regulation is therefore irrelevant for present purposes: only a museum's decision that it did *not* have possession or control of the items in its collection would be subject to immediate legal review, *id*. § 10.1(b)(3), while a museum's decision to apply NAGPRA would be reviewable only at the end of the process, *see id*. §§ 10.1(b)(3), 10.10(c).

Here, the relevant question is who is entitled to obtain the human remains and artifacts currently in the Park Service's hands, and that is the very question which NAGPRA is designed to answer. The Navajo Nation's claims to the human remains and artifacts are not superior on their face to the claims of the Hopi and Zuni Tribes, and federal law requires the Park Service to proceed through a step-by-step process for making these cultural affiliation and repatriation determinations. The Navajo Nation's desire to short-circuit

---

institution or State or local government agency (including any institution of higher learning) that has *possession* of, or *control* over, human remains, funerary objects, sacred objects, or objects of cultural patrimony and *receives Federal funds*." *Id*. § 10.2(a)(3) (emphasis added). In three subsections under the definition of museum, the regulations define each of the key terms in that definition: "possession," *id*. § 10.2(a)(3)(i), "control," *id*. § 10.2(a)(3)(ii), and "receives Federal funds," *id*. § 10.2(a)(3)(iii). The definition of "possession," as used in the definition of "museum," is "having physical custody of human remains, funerary objects, sacred objects, or objects of cultural patrimony with a sufficient legal interest to lawfully treat the objects as part of its collection for purposes of these regulations." *Id*. § 10.2(a)(3)(i). The regulation then explains that "[g]enerally, a museum or Federal agency would not be considered to have possession of human remains, funerary objects, sacred objects, or objects of cultural patrimony on loan from another individual, museum, or Federal agency." *Id*. Because this language is included as part of the definition of "museum," it provides a safe harbor for museums that do not want to engage in the expense of applying NAGPRA to items that are on loan from a third party, but would face penalties under § 10.2 if they failed to implement the NAGPRA process as required by statute.

Congress's plan is not sufficient to transform that ongoing process into a "final agency action."

## IV

In sum, the Park Service is making a good faith effort to comply with federal law, which requires it to engage in a deliberate and open process to determine who is entitled to the human remains and artifacts it currently holds. The majority's strained attempt to detect a "final agency action" occurring at some point along the way, without a decisionmaking process, a written decision, or a determination that has any legal effect on the Navajo Nation, has no support in the record or in our precedent. Because there is no final agency action reviewable under § 704, the United States has not waived its sovereign immunity and we lack jurisdiction to hear this appeal. Accordingly, I dissent.